661 So.2d 867 (1995)
BEVERLY ENTERPRISES-FLORIDA, Inc. d/b/a Eastbrooke Health Care Center, Appellant,
v.
Wilbur W. SPILMAN, As Personal Representative of the Estate of Walter M. Spilman, Appellee.
No. 94-376.
District Court of Appeal of Florida, Fifth District.
September 29, 1995.
Gail Leverett Parenti of Parenti, Falk, Waas & Frazier, Coral Gables, for appellant.
Joel S. Perwin of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Ollin & Perwin, P.A., Miami, amicus curiae for Nursing Home Hotline.
David R. Gemmer and James L. Wilkes, II, of Wilkes and McHugh, Tampa, and Dennis J. Wall, Orlando, for appellee.
A.E. (Ned) Pooser, IV, Tallahassee, amicus curiae for Office of State Long-Term Care Ombudsman.
PETERSON, Chief Judge.
Appellant, Beverly Enterprises-Florida, Inc. d/b/a Eastbrooke Health Care Center (Eastbrooke), appeals a final judgment awarding $719,064.02 in compensatory damages *868 and $2,000,000 in punitive damages to appellee, Wilbur W. Spilman, as personal representative of the estate of Walter M. Spilman. Wilbur's father, Walter, died after he was admitted to a hospital for treatment of infections allegedly contracted while he was under Eastbrooke's care. Eastbrooke contends first that the trial court violated the provisions of section 400.023, Florida Statutes (1991), by denying its motion to dismiss claims for pain and suffering and by instructing the jury that such damages could be awarded. Second, Eastbrooke alleges the trial court erred by denying its motion for directed verdict on the issue of punitive damages, because the evidence was insufficient to demonstrate malicious or willful disregard of Walter's rights as a nursing home patient.

PAIN AND SUFFERING UNDER SECTION 400.023
Eastbrooke contends that the trial court erred in denying its motion to dismiss claims for Spilman's pain and suffering and in instructing the jury that they could award such damages. Eastbrooke submits that where a cause of action pursuant to section 400.023, Florida Statutes (1991), is advanced under a theory that the person has died as a result of the deprivation of his nursing home resident's rights, the nature and measure of damages are controlled by the Wrongful Death Act, sections 768.16  .27, Florida Statutes (1991), rather than by the survival statute, section 46.021, Florida Statutes (1991). Sections 768.16  .27 do not provide for an award of damages for the decedent's physical and mental pain but section 46.021 does allow such damages.
We find no error in the trial court's denial of the motion to dismiss. Section 400.022, Florida Statutes (1991), sets forth the specific rights of nursing home residents. The civil enforcement statute, section 400.023, Florida Statutes (1991), further provides as follows:
Any resident whose rights as specified in this part are deprived or infringed upon shall have a cause of action against any licensee responsible for the violation. The action may be brought by the resident or his guardian, by a person or organization acting on behalf of a resident with the consent of the resident or his guardian, or by the personal representative of the estate of a deceased resident when the cause of death resulted from the deprivation or infringement of the decedent's rights. The action may be brought in any court of competent jurisdiction to enforce such rights and to recover actual and punitive damages for any deprivation or infringement on the rights of a resident. Any plaintiff who prevails in any such action may be entitled to recover reasonable attorney's fees, costs of the action, and damages, unless the court finds that the plaintiff has acted in bad faith, with malicious purpose and that there was a complete absence of a justiciable issue of either law or fact. Prevailing defendants may be entitled to recover reasonable attorney's fees pursuant to s. 57.105. The remedies provided in this section are in addition to and cumulative with other legal and administrative remedies available to a resident and to the agency.[1]
(Emphasis added).
When section 400.023 was first enacted in 1980, it addressed only the rights of residents who survived the violation of their rights and allowed them to seek actual and punitive damages.[2] However, this problem was later recognized  as reflected in transcripts *869 of the committee hearings on House Bills 154 and 79 of the 1985 Regular Session:
HOUSE BILL NO. 154:
REP. CANADY: This bill would amend Chapter 400, which sets forth the law concerning nursing homes. And in Chapter 400 currently there is set forth sort of a nursing home residents' Bill of Rights. It's a detailed listing there of the rights that the people who live in nursing homes have under the law. The law also gives the residents of nursing homes the right to bring a legal action to enforce those rights if they're violated. So essentially, if a resident of a nursing home is mistreated in some way  and that's really what it all boils down to  then the resident can sue the operator of the nursing home for damages and so on to redress that wrong that has been done. There's an anomalous situation under the laws that now exist in that although a resident can do that, if the resident is treated so badly that the resident actually dies as a result of that, the cause of action does not survive so that no suit can be brought. In my home county we had this exact same situation come up. So the proposed  the proposal here would be to simply extend that cause of action to the personal representative of the estate of a deceased nursing home resident.
* * * * * *
REP. BILL BANKHEAD: Would you have any idea as to the limits of liability for the nursing home owners that might arise out of a suit so foul?
CHAIR: Don't get yourself going, Mr. Bankhead, he may know the answer to that.
REP. CANADY: It would be the same as the  if a cause of action were brought by a living resident.
REP. DAVE THOMAS: Could I make one comment to Mr. Bankhead? ... Are you implying that we should limit the liability of nursing homes that beat people to death?
CHAIR: All in jest. Secretary call the roll on the bill. [Bill passes].
* * * * * *
HOUSE BILL NO. 79:
REP. CANADY: Members, this bill has been before the Committee before and actually has passed the House last session. It is a bill changes Chapter 400. Under Chapter 400 currently the residents of nursing homes are given certain rights, basically the right to be treated decently and receive proper care. They are also given a legal remedy in case those rights are violated and not properly honored. However, there's an anomaly under the law in that if a nursing home resident is abused and they survive that they can bring a lawsuit. However, if they're abused so badly that they die, the cause of action is lost. So this bill would simply amend the statute to provide that the personal representative of the estate of a deceased nursing home resident would also be able to bring an action under Chapter 400 to redress the rights of a deceased nursing home resident. [Bill passes].
Ultimately, Senate Bill No. 128, amending section 400.23 to provide for actions being brought by the decedent's personal representative, became law on June 9, 1986. Ch. 86-79, § 1, at 2, Laws of Fla. The answer brief of the Office of State Long-Term Care Ombudsman also points out:
Under [Eastbrooke's] theory, it would be cheaper for a nursing home to kill its residents and thereby limit claims by personal representatives to the damages listed in the Wrongful Death Act. Such construction not only offends the strong public policy that nursing homes are to "promote maintenance or enhancement of the quality of life of each resident," but basic statutory construction. See Williams v. State, 492 So.2d 1051, 1054 (1986) (statutes should not be given a meaning that leads to an absurd or unreasonable result).
Both the plain language of the statute and the transcripts of the committee hearings indicate that the legislature did not intend for damages under section 400.023 to be limited by the Wrongful Death Act where the nursing home's infringement or deprivation of the patient's rights resulted in the patient's death.

*870 PUNITIVE DAMAGES

Eastbrooke contends that the trial court erred in denying its motion for directed verdict on the issue of punitive damages because it believes the evidence was insufficient to demonstrate that its agents acted in a manner that was malicious or in willful disregard of the rights of others.
Section 400.023(1), Florida Statutes (1991), allows recovery of punitive damages when the rights of nursing home residents are violated. Eastbrooke admitted that it violated Walter Spilman's rights under the statute, but that admission does not necessarily invite liability for punitive damages. In order to warrant an award of punitive damages, one district court requires a character of negligence evincing willful, wanton, and intentional misconduct sufficient to sustain a conviction for manslaughter. Key West Convalescent Ctr., Inc. v. Doherty, 619 So.2d 367 (Fla. 3d DCA 1993). The supreme court has declared:
The character of negligence necessary to sustain an award of punitive damages must be of a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them".
White Constr. Co. v. Dupont, 455 So.2d 1026, 1029 (Fla. 1984) (quoting Carraway v. Revell, 116 So.2d 16, 20 n. 12 (Fla. 1959)).
Our review of the record in the instant case leads us to conclude that the jury could reasonably find that the acts and omissions of Eastbrooke warranted an award of punitive damages against it in accord with the character of negligence declared in White.
The evidence of misconduct presented to the jury came in the form of testimony from former employees of Eastbrooke and relatives of the decedent. A brief history of his stay at the nursing facility follows.
Walter Spilman (age 88), suffered from Alzheimer's disease and senile dementia and had been treated for prostate cancer. After a fall caused a subdural hematoma, he was admitted to a hospital in October 1989 for surgery to decrease pressure in his brain. Following surgery, he was in need of rehabilitative therapy, including incontinence training, and was admitted as a resident of Eastbrooke's nursing home. While there, he was sedated and kept in restraints, and his skin began to break down. He was eventually admitted to a hospital for an evaluation, and when his health improved he was returned to the nursing home on April 6, 1990. He remained a resident until July 18, 1990. During this time, he lost approximately 32 pounds, his bedsores became necrotic, and he lost the ability to eat and swallow. On July 18, 1990, Spilman was admitted to another hospital where a feeding tube was placed in his stomach. He was returned to Eastbrooke on July 23, 1990, where he again declined. Finally, he was again admitted to a hospital on October 3, 1990, and subsequently died on October 15, 1990.
The testimony describing Spilman's treatment at Eastbrooke included:
1. Spilman lost an excessive amount of weight, became increasingly confused and agitated, and became non-ambulatory.
2. He was seen restrained in a geri-chair (in a vest with ropes which tied in the back) almost every day for hours at a time.
3. If the nursing home was understaffed, he was often left sitting in soiled clothing, and on a number of occasions he attempted to untie his restraints to escape his chair. When he was unsuccessful, he dragged the chair around with him.
4. He was supposed to receive help eating, but if the nursing home was understaffed, he received no help and his tray was thrown away. At times his chart was documented to show that he was fed when he was not.
5. When a stomach tube was placed in his stomach in order to provide him with nourishment, on many occasions nurses did not properly refill it for hours at a time. An employee who worked on Spilman's wing of *871 the nursing home during the day shift testified that when the stomach tube was in place he was supposed to receive 30 minute feedings two times per shift. When she was rushed, however, she had to do the feeding in five to eight minutes. She stated that the tube site looked "nasty" and was draining and that Spilman suffered from deep draining pressure sores. His bandages were supposed to be changed and initialed on every shift. Sometimes the bandages were changed from day to day; other times they were not.
6. Spilman had deep bedsores on his hips and buttocks and the odor was strong outside his room.
7. Each wing of the home normally contained 60 patients to be cared for by one charge nurse, one regular nurse, and three certified nursing assistants (CNA's).
8. A CNA was often asked to perform jobs that were supposed to be nurses' jobs.
9. The head nurse was often unavailable for hours at a time. She spent 60% to 70% of her time in a room with her friend who was a patient.
10. A CNA was often told to fill in "holes" in charts of patients who were not assigned to her. She complained about conditions at the nursing home to the nurses and to the director of nursing, and eventually she was fired.
11. A CNA acknowledged that Spilman received better care when his family came to see him.
12. The nursing home knew when the state would come to inspect, and, on those occasions, staffing was increased and care improved. The walls were painted, the floors were buffed, and new linens, diapers and towels were provided. The linens were taken back after the inspection, however.
13. On many occasions Spilman and other patients were seen in beds and chairs which were wet with body waste. Spilman was seen restrained in a geri-chair with dried waste on his back and legs and a puddle on the floor.
14. Employees were often told to fill in spaces on the chart (sometimes two months previously). One employee testified that she just followed along with what everyone else wrote in.
15. Spilman's record at Eastbrooke reflected charting entries eight days after he left the nursing home.
16. Spilman was seen lying in bed naked, once by his daughter-in-law when the door to his room was left open. She testified that sometimes he was clothed in a nursing gown and a diaper and sometimes he was not. She explained that she requested a special bed for the treatment of the bedsores but was told that it was too expensive. No one told her the bed could be rented.
17. The Administrator of Nursing at Eastbrooke testified that the Director of Nursing at the time Spilman was in the home was not competent in a lot of managerial/organizational skills, although her nursing skills were good. She also admitted that administration and management were the Director's primary duties as director.
18. A treating physician testified that Spilman suffered from one of the worst cases of bedsores he had ever seen. The physician stated that he "couldn't believe it" when he first examined Spilman. He discovered that the tissue in Spilman's hips was rotted well into both hip joints, surrounding muscles, tendons and ligaments. His post-operative diagnosis was osteomyelitis, a bone infection, which was indicated by bone coated in fluid, the periosteum rotted away from the bone, and the bone gray and non-viable. When he saw Spilman in the hospital, his injuries were beyond repair.
19. A gerontological nurse practitioner, who was an instructor of nursing at Southern Florida College of Nursing and an adult abuse investigator for HRS, testified that she reviewed Spilman's records and noted a number of discrepancies and problems in his treatment. He was ordered to be restrained during his first month at Eastbrooke, but the doctor's orders were never renewed. The records indicated that he continued to be restrained after that time. He struggled to get out of his restraints and responded to them with anger and agitation. She believed that his aggressive behavior was consistent *872 with fear and with being restrained. She explained that Spilman should have been released from the restraints every two hours to prevent bedsores, but apparently was not. Spilman's skin began to break down in March and he suffered a number of falls (although apparently no broken bones). She noted that a facial bruise was indicated on the chart, although the cause of it was not investigated. After he was transferred to a hospital, Spilman's medications were changed and he became more stable. He was then sent back to a less critical ward at Eastbrooke, and the following 12 days of nursing notes were missing. In one month he lost at least 18 pounds and may have lost up to 32 pounds. She noted that the chart contained a lot of notations that Spilman consumed 100% of his food, but those notes were not consistent with his weight loss. She stated that the charting was very deficient, that there was no evidence in the records that a care team plan was ever instituted to address Spilman's problems, and she gave her opinion that Spilman was abused. She stated that it was the nurses' responsibility to prevent this dehumanization. Although the record indicated evidence of cowering and crying, as well as his family's concern that he was in pain, Spilman was never given pain medication. While at Eastbrooke, Spilman suffered from repeated urinary infections and contracture of the leg muscles (muscle contractions from failure to stretch) which usually coincided with his behavior accelerations. She described a photograph of him showing excoriated buttocks and explained that the condition was consistent with skin irritated or "cooked" by excreta, which was consistent with being restrained in a chair for extended periods of time.
20. A medical director at the Gainesville VA Medical Center Nursing Home Care Unit testified as an expert witness that she had also reviewed Spilman's files and found numerous deprivations of his rights. She did not believe his previous cardiac problems and prostate cancer influenced his condition at Eastbrooke. Spilman's records indicated that, at the time of his death, he suffered from malnutrition, dehydration, and the most severe pressure sores possible. It was her opinion that his treatment constituted neglect and abuse if Eastbrooke did not do what they were supposed to do and falsely documented records. A dietician should have been working with the doctors and nurses to increase his weight, and she would expect a one pound per week increase with a feeding tube in place. A "failure to thrive" would not have caused Spilman's weight loss, and Eastbrooke should have been able to maintain his nutrition on the tube. After reviewing the file, she stated that she was outraged and that people with Alzheimer's disease do not die as Spilman died if they received proper care. Spilman would not have suffered from Grade 4 pressure ulcers or malnutrition under her care. She felt that Spilman clearly was neglected.
21. An expert witness noted that the records showed that Spilman received massages over areas of bony protuberance which caused more tissue damage. She stated that the records also described drainage from the bedsores which were improperly treated with Duoderm. Duoderm holds in infection and does not allow wounds to drain, causing osteomyelitis. She stated that the nurses did not always seem to know what they were doing, that the charting was inadequate, and that she could not follow the assessments. From the records, she explained that Spilman was 5'7" and weighed approximately 166 pounds. The records indicated that the nursing home felt he was overweight and their stated goal was for him to lose weight. She found no assessment of pain, but felt it was reasonable to believe his condition was painful.
The only expert witness for Eastbrooke was an assistant professor in the Department of Medicine at the University of South Florida. He testified that he reviewed Spilman's records and that, although the chart was complete, there "were certainly gaps". He stated that Spilman was suffering from multiple disease processes and received mixed care. Although some of Spilman's treatment was substandard and less than optimum, the nursing home appeared to have been working with him and trying to offer him some care. On cross-examination, he admitted he did not know a lot about the actual circumstances. He also admitted that it would be terrible *873 practice to restrain someone in their own waste matter, and agreed that most pressure sores were preventable.
Eastbrooke's motion for directed verdict was based upon the arguments that the egregious conduct of its employees did not rise to the level that would incur punitive damages, that no evidence existed indicating that there was any fault on the part of the employer, and that no evidence existed that the employer's supervisors were aware of any mistreatment of the decedent.
When claims for punitive damages are made, the trial court is to decide at the close of evidence whether there is a legal basis for recovery of punitive damages shown by any interpretation of the evidence favorable to the plaintiff. Wackenhut Corp. v. Canty, 359 So.2d 430 (Fla. 1978). The court determined that a legal basis existed and we agree.
In Schropp v. Crown Eurocars, Inc., 654 So.2d 1158 (Fla. 1995), the supreme court reviewed the two methods by which a corporation may be held liable for punitive damages. The first method, vicarious liability, requires willful and wanton misconduct on the part of the employee and some fault on the part of the employer, not necessarily willful or wanton misconduct, which foreseeably contributed to the plaintiff's injury. The second method, direct liability, requires evidence of willful and wanton misconduct by a managing agent or officer of the corporation. We believe that evidence of both exists in the instant case.
The business of operating a nursing home facility is a specialized activity. Its residents are in need of special care for many reasons. Some are mentally alert, but their bodies are frail or weak. Others are the opposite. Some suffer from both, and Spilman was one of them. All must depend upon others to sustain their lives in as dignified and comfortable a manner as possible. They are completely dependent upon the employees of the nursing home, who are supposed to be guided and directed by the nursing home's supervisors. Federal and state governments recognize these special needs and provide billions of dollars for the care of many of the residents and attempt to strictly regulate nursing home operations.
Walter Spilman was totally dependent upon Eastbrooke for every aspect of his care for he was frail of both mind and body. He was unable to meaningfully protest about any mistreatment. Perhaps he did muster enough strength to protest at one time, but that was suppressed with restraints. Instead he cried. Perhaps he cried in protest; perhaps he cried in pain because preventable bedsores developed to the stage that portions of his bone structure were destroyed.
Eastbrooke attempts to evade punitive responsibility for the deplorable treatment of Walter Spilman at its facility by arguing that its managing employees knew nothing of the abuse for which it admitted liability. It says that its managing officers did nothing to inflict the abuses, did not know of them, and were not negligent in any manner. Therefore it argues that it cannot be held responsible under either theory of corporate liability for punitive damages. But Eastbrooke cannot escape responsibility by managing its facility with managers who close their eyes, refuse to hear, and dull their sense of smell. Certainly, Eastbrooke's managing agents should not be charged with knowing every isolated event that occurs, but the events surrounding Walter Spilman were not isolated. Walter Spilman was a resident of this nursing home for a year and had been removed to a hospital for treatment of bed sores incurred in its facility. Eastbrooke's administrator testified that she had not been familiar with Spilman's plight. Surely she was familiar with the rapid transformations to neatness and cleanliness when a state inspection was imminent. She testified that she was aware of the incompetency of the director of nursing in "managerial organizational skills." It is difficult to imagine that an employee with managerial responsibilities either knew of Walter Spilman's plight and failed to take any action to assist this totally dependent human being or so totally ignored the operation of the nursing facility that Walter Spilman's plight went unnoticed. Either situation exhibits a reckless disregard of human life or of the safety of persons exposed to its dangerous effects, or reckless indifference *874 to the rights of Walter Spilman for whom the nursing home was being compensated for every detail of sustaining his life in the most dignified and comfortable way possible. Walter Spilman's life expectancy and joy of living were not great because of the illnesses he suffered before he entered Eastbrooke, but no one expected upon his entrance that those who were being paid to sustain his life in as much comfort as possible would violate the rights prescribed by Florida's statute to the point that he would die from bedsores rather than his other, more life-threatening illnesses.
This is not the first case in which a district court has upheld the award of punitive damages when a nursing home resident succumbs to decubitus skin ulcers. In Payton Health Care Facilities, Inc. v. Estate of Campbell, 497 So.2d 1233 (Fla. 2d DCA), review denied, 500 So.2d 545 (Fla. 1986), a jury's award of punitive damages against a nursing home was affirmed. There, the court weighed the care used by the nursing home to determine whether there was "an outrageous deviation from the acceptable standard." We are not aware of the detailed facts of that case because they were not set forth in the opinion; it is difficult to imagine that the abuse in that case could outweigh that present in the instant case.
The judgment is affirmed.
AFFIRMED.
DAUKSCH, J., concurs in conclusion only.
W. SHARP, J., concurs and concurs specially, with opinion.
W. SHARP, Judge, concurring specially.
There is little I can add to Chief Judge Peterson's excellent opinion in this case. I write only to say we should never cease to be shocked by Man's inhumanity to Man, no matter the circumstances. And, a remedy must always be afforded.
NOTES
[1] Section 400.023, Florida Statutes, was amended on July 1, 1993, by the addition of several subsections. Subsection (5), which applies to actions occurring on or after the amendment's effective date, provides:

(5) For the purpose of this section, punitive damages may be awarded for conduct which is willful, wanton, gross or flagrant, reckless, or consciously indifferent to the rights of the resident.
The legislature has provided that "[s]ubsections (2), (3), (4), and (5) of section 400.023, Florida Statutes, ... shall not be relied upon for the purpose of ascertaining legislative intent as to the interpretation of section 400.023, Florida Statutes, as it existed prior to July 1, 1993." Ch. 93-217, § 51, at 2296, Laws of Fla. See also note 2 following § 400.023.
[2] The Wrongful Death Act, sections 768.16  768.27, Florida Statutes, was first enacted in 1972.