740 So.2d 1189 (1999)
FIRST HEALTHCARE CORPORATION d/b/a Boca Raton Rehabilitation Center, and Linda McClamma, individually, Appellants,
v.
William E. HAMILTON, as Personal Representative of the Estate of Charles L. Barnes, deceased, and on behalf of Margaret Barnes, survivor.
Nos. 98-1992, 98-2477.
District Court of Appeal of Florida, Fourth District.
June 30, 1999.
Opinion Denying Rehearing August 18, 1999.
*1191 Douglas H. Stein of Anania, Bandklayder, Blackwell & Baumgarten, Miami, for appellants.
Richard D. Schuler of Schuler & Halvorson, P.A., and Philip M. Burlington of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, for appellee.
Edward J. Lyons of Milcowitz & Lyons, P.A., Clearwater, for Amicus Curiae-The Coalition to Protect America's Elders.
PER CURIAM.
A nursing home operated by First Healthcare Corporation ("First Healthcare") failed to properly supervise a resident, Charles Barnes. As a result, Mr. Barnes wandered from the premises unaccompanied, fell into a nearby pond and drowned. The personal representative of the decedent's estate sued First Healthcare and its administrator. The jury awarded both compensatory and punitive damages against First Healthcare and compensatory damages against the administrator. We have consolidated the defendants' two appeals, one being from the judgment entered on the verdict, and the separate judgment for attorney's fees, and the other being from the judgment for costs. Of the multiple issues raised by appellants, the more significant of which are discussed below, we find only one has meritthe allowance of compensatory damages for the decedent's pain and suffering.
The complaint alleged both common law and statutory claims against First Healthcare. The common law claims were that First Healthcare negligently failed to provide (a) appropriate protective and support services; (b) proper supervision; (c) a properly maintained physical plant; and (d) adequate systems for Barnes' protection, supervision, and safety. The statutory claims were that First Healthcare violated section 400.022, Florida Statutes (1995), by failing to provide adequate and appropriate healthcare and protective support services by (a) allowing Barnes to wander from the facility unaccompanied; (b) failing to have adequate alarm systems to alert the staff when Barnes did leave the facility; and (c) failing to have adequate staff to enforce supervisory policies.
The complaint alleged that the administrator negligently failed to (a) provide adequate staffing for the proper protection and supervision of Barnes; (b) provide and maintain the physical plant; and (c) employ certain systems available for the safety of Barnes.
The complaint further alleged that as a result of defendants' negligence, Barnes wandered from the facility unaccompanied, accidently fell into a pond and drowned on December 30, 1996. Plaintiff sought compensatory damages, and later, pursuant to section 768.72, Florida Statutes (1995), was granted leave to amend by adding a claim for punitive damages.

APPLICABILITY OF CHAPTER 766 PRE-SUIT REQUIREMENTS
At the pleading stage the defendants unsuccessfully sought dismissal of the complaint due to plaintiff's undisputed failure to comply with the pre-suit requirements of section 766.106, Florida Statutes (1995). Defendants' argument, that the court erred in denying their motion to dismiss, goes like this: (1) although a nursing home is not itself a health care provider under Chapter 766, Florida Statutes, see NME Properties, Inc. v. McCullough, 590 So.2d 439, 440-41 (Fla. 2d DCA 1991), it is nonetheless entitled to the benefits of the pre-suit requirements of section 766.106 when it is charged with vicarious liability for the acts of health care providers, see Weinstock v. Groth, 629 So.2d 835, 836-38 (Fla.1993); (2) the complaint sought to impose vicarious liability on First Healthcare on the basis that the medical care and treatment rendered to Barnes by the nursing personnel was inadequate, *1192 specifically, that Barnes died because nursing personnel failed to properly assess his cognitive status; and (3) therefore, this suit, though masked as a claim for common law and statutory negligence, is in actuality a medical malpractice case. We find the premise to be faulty and the argument without merit.
It is clear to us that the gist of plaintiff's complaint, and the substance of his proof, was that defendants' negligence was in their failure to provide for the protection, supervision, and safety of the decedent, not in their failure to properly diagnose or treat him. Consistent with the allegations of the complaint, plaintiff proved that the defendants were negligent in failing to provide a secure facility for Barnes, including the failure to provide him with a wanderguard device, and the failure to repair the sliding glass door in his room which was stuck in an open position wide enough for Barnes to exit. The plaintiff also proved that the facility was understaffed on the night of decedent's death, and that the staff was aware that he frequently had wandered away in the past, yet failed to take adequate action to prevent such conduct from happening again.
None of these acts of negligence involve any issue regarding medical diagnosis or treatment. Even if the recited conduct had occurred in a health care provider's facility it would not have constituted medical malpractice. See, e.g., J.B. v. Sacred Heart Hosp. of Pensacola, 635 So.2d 945, 948-49 (Fla.1994); Feifer v. Galen of Florida, Inc., 685 So.2d 882 (Fla. 2d DCA 1996); Robinson v. West Florida Reg'l Med. Ctr., 675 So.2d 226 (Fla. 1st DCA 1996). The court properly denied the motion to dismiss.

PROPRIETY OF SANCTION FOR DEFENDANT'S DISCOVERY ABUSES
The court determined that the corporate defendant's persistent discovery abuse during the course of the case was egregious and, coupled with the obvious prejudice to plaintiff's preparation of his case, justified the imposition of sanctions. Accordingly, although refusing plaintiffs request to strike defendant's pleading, the court elected to give the jury a pre-emptive instruction that First Healthcare was deemed to be on notice that Barnes would frequently leave the premises and that upon leaving he was a danger to himself and others.
Defendant argues that this sanction was a gross abuse of discretion because (1) defendant did not engage in any sanctionable conduct, (2) plaintiff was not prejudiced, and (3) the sanction, which defendant says effectively imposed a directed verdict against them, was disproportionate to defendant's conduct.
The matter of determining noncompliance with discovery orders and the imposition of sanctions, if any, is committed to the sound judicial discretion of the trial court. See Mercer v. Raine, 443 So.2d 944 (Fla.1983). Our review of the trial court's exercise of its discretion in this instance is not governed by whether we might have imposed a greater or lesser sanction, but whether reasonable persons could differ as to the propriety of the sanction imposed by the trial court. See id. at 946.
We have no difficulty in concluding that under that test there was no abuse of discretion. The record shows conduct on the part of the defendant from which the court could fairly and reasonably find that, from the outset, the defendant deliberately engaged in a pattern of discovery abuse. That conduct included making frivolous objections and misrepresentations to the court, refusing to comply with both the letter and spirit of the court's orders, and concealing of relevant requested materials. Though a complete recital of defendant's conduct would unduly lengthen this opinion, some recitation is required to give the flavor of that which the court perceived.
With the complaint, the corporate defendant was served with a request to produce *1193 which sought ten items of basic discovery materials. The documents sought included (1) the corporate defendant's policies and procedures manual; (2) a list of its employees; (3) a list of its medical staff; (4) decedent's medical records; (5) any and all incident reports for Barnes's death; and (6) any and all incident reports for any prior occasions when Barnes left the premises unattended. The requests were relatively simple and most were facially proper objects of discovery.
Instead of producing the requested documents, defendant asserted as to each of the requested items (except # 9 and # 10, as to which no objection was made) the boilerplate objection that the request was "overbroad, burdensome, and not reasonably calculated to lead to the discovery of admissible evidence."[1] In addition, items # 5 and # 6 were also objected to on the basis of "attorney work product."
At the hearing on plaintiff's motion to compel, held nearly six months after the request had been served, defendant argued the incident reports were privileged (but did not inform the court that the incident reports had been destroyed), and abandoned most of the other objections which had been made to the document request. The court found that defendant had filed its objections in bad faith, stating:
[W]hen someone comes into court having objected to a request specifically as having been overbroad, burdensome and not reasonably calculated to lead to admissible evidence and then comes in and says, gee, as to the policies, no reason why we couldn't provide them; as to the billings, he's entitled to them, I don't know why we didn't give them to him; as to other items, we've already given it to him, that leads the court to the conclusion that this objection was not made in good faith.
The court awarded attorney's fees and ordered defendant to produce the incident reports for an in camera inspection with a privilege log and an affidavit of the basis of the claimed privilege.
The defendant, without complying with the order, filed its Notice of Compliance. This document stated, for the first time, that defendant did not have in its possession an incident report pertaining to the incident of December 30, 1996 (other than the report in the patient's medical chart), and that it did not have in its possession any incident reports pertaining to any prior occasions where Charles Barnes was purported to have wandered from the premises of the facility unaccompanied.[2]
Plaintiff, armed with earlier deposition testimony from defendant's director of nursing to the effect that she and the administrator had a copy of an event report for the incident involving Barnes's death, filed a second motion for sanctions. Defendant, thus caught "red-handed," filed a "Verified Response" which stated that upon additional inquiry an "event report" for Barnes' death had been found, but that it had not previously looked for an "event report" because plaintiff had only requested "incident reports." Defendant also filed a privilege log identifying the "event report" as the Continuous Quality Improvement ("CQI") record.
*1194 At the hearing on plaintiff's motion for sanctions, defendant's counsel stated to the court that there had been confusion as to whether "something is an incident report or something is an event report," and asked the court for a determination whether the event report was the type of thing that should be provided to plaintiff. Counsel did not inform the court or plaintiffs counsel that there were other "event reports" involving Barnes' prior wandering incidents, but instead stated that the CQI record which had been provided to the court in camera, along with the privilege log, was all that existed. Though the court did not state expressly that the event report was the type of thing that defendant should produce, it clearly did so by necessary implication when it ordered production of the "event report" and granted plaintiffs motion for sanctions.
The finale in the matter of defendant's discovery abuses came, somewhat fortuitously, during the trial. Testimony by defendant's Director of Nursing disclosed that the reporting slip "takes the place of the old ... incident reports"; that the incident reports were discarded after the information was transferred to the "event report" in the CQI record; and that there were other event reports regarding Barnes. That disclosure, which was the first time the court or plaintiffs counsel had been informed that other event reports existed, was apparently what precipitated the sanction of which defendant now complains. The court ordered defendant to produce the monitoring record for all incidents involving Barnes.
The following morning defendant produced seven "event reports" for incidents involving Barnes, three of which involved occasions when he had left the facility unaccompanied. In attempting to defend defendant's failure to produce these event reports previously, defense counsel stated to the court, "[h]onestly, it was not until yesterday when Your Honor made the order did I request or search for prior CQI monitoring records...." Although defendant continued to justify its conduct by arguing to the court (as it does before us) that these documents were event reports whereas plaintiff had requested, and the court had ordered, production of, incident reports, the court obviously was not impressed with such argument.[3]
As stated, defendant also contends that defendant's conduct did not prejudice plaintiff and, in any event, the sanction was disproportionate to the conduct. Part of defendant's argument is that since plaintiff did receive the event reports at trial and was able to use them in evidence, no prejudice resulted from defendant's failure to produce them sooner. However, the court, in stating the basis for its determination to impose sanctions, recognized that defendant's discovery abuse had caused prejudice to plaintiffs efforts to prepare for trial in that, had the "event reports" been timely produced, plaintiff would have acquired helpful information not otherwise available to him.
Finally, we do not find the sanction disproportionate to the discovery abuse. We not only agree with the court's finding that the conduct was egregious, but we also note that the sanction was well within the range of sanctions that we think would have withstood successful attack on appeal. In addition, there was more than ample evidence from which the jury would likely have found as a fact the matters which the court made the subject of a preemptive instruction.[4]

THE DAMAGES FOR DECEDENT'S PAIN AND SUFFERING
Over the objection of the defendants, and on the strength of the decision *1195 in Beverly Enterprises-Florida, Inc. v. Spilman, 661 So.2d 867 (Fla. 5th DCA 1995), the trial court allowed plaintiff's claim for damages for decedent's pain and suffering between the injury and time of death to be considered by the jury. The jury awarded $1,000,000 for this specific element of plaintiff's damages. The evidence most favorable to plaintiff was that Barnes was conscious when he fell into the pond and remained conscious for a period of no more than two minutes. Defendants' argument is two-pronged: (a) there is no entitlement to damages for decedent's pain and suffering arising from the same injuries causing death; and (b) the jury award for decedent's pain and suffering is excessive as a matter of law. While the jury verdict was patently excessive, we need not decide or even discuss that issue. We hold, in direct conflict with Spilman, that the personal representative of a deceased nursing home resident, just as in the case of the personal representative of any deceased, may not recover damages for decedent's pain and suffering arising from the same injuries causing death.
Because wrongful death actions did not exist at common law, all claims for wrongful death are created and limited by Florida's Wrongful Death Act. See Cinghina v. Racik, 647 So.2d 289, 290 (Fla. 4th DCA 1994). Section 768.20, Florida Statutes (1995), expressly provides that "[w]hen a personal injury to the decedent results in his death, no action for the personal injury shall survive." Our supreme court has recognized that it was the legislative intent of the Wrongful Death Act to eliminate the claim for pain and suffering of the decedent from the time of injury to the time of death, substituting therefore a claim for the pain and suffering of the survivors. See Martin v. United Sec. Servs., Inc., 314 So.2d 765, 767 (Fla.1975). That an estate's personal representative may not recover damages for the decedent's pain and suffering from the injuries causing death is settled law. See, e.g., Metropolitan Life Ins. Co. v. McCarson, 429 So.2d 1287, 1291 (Fla. 4th DCA 1983), modified, 467 So.2d 277 (Fla.1985).
Thus, the issue here can be framed quite succinctly. Does section 400.023, Florida Statutes (1995), grant to the personal representative of a deceased nursing home resident entitlement to an element of damages to which the personal representative of a deceased not a resident of a nursing home would not be entitled, i.e., damages for decedent's pain and suffering from the injuries causing death? No Florida appellate court decision on this issue, other than Spilman, has been brought to our attention.[5] In the absence of other authority, the trial court was obligated to follow the Spilman case. See Pardo v. State, 596 So.2d 665, 666 (Fla.1992). However, we think that on this specific issue Spilman was incorrectly decided for several reasons.
First, the 1986 amendment to section 400.023, which the Spilman court construed, simply created in the personal representative of a deceased nursing facility resident, whose death resulted from deprivation or infringement of the decedent's rights, a cause of action against the nursing facility to enforce such rights and recover actual and punitive damages for any deprivation of or infringement on the rights of a resident. There is nothing unclear or ambiguous in the legislative language, and thus the legislative intent must be determined primarily from the language of the statute. See Aetna Cas. & Sur. v. Huntington Nat'l Bank, 609 So.2d 1315, 1317 (Fla.1992). It appears evident that the Spilman court, in reaching its decision as to the legislative intent, leaned heavily on the legislative committee reports. *1196 But, a long line of Florida case law holds that the legislative history of a statute is irrelevant where the wording of a statute is clear. See, e.g., Aetna Cas. & Sur., 609 So.2d at 1317; Suwannee River Water Management Dist. v. Pearson, 697 So.2d 1224, 1226 (Fla. 1st DCA 1997).
Second, there is absolutely no language in the amendment to the statute that suggests, much less states specifically and explicitly, that the statute was intended to change the common law and allow the personal representative of a deceased nursing facility resident to recover damages for the resident's pain and suffering from injuries causing the resident's death. The law is well settled that unless a statute unequivocally states that it changes the common law, or is so repugnant to the common law that the two cannot coexist, the statute will not be held to have changed the law. See State v. Ashley, 701 So.2d 338, 341 (Fla.1997).
Third, to hold as the Spilman court did would clearly conflict with the Wrongful Death Act, which was enacted for the express purpose of eliminating any claim for these damages, see Martin, 314 So.2d at 767, and would allow multiple actions and multiple claims for pain and suffering contrary to clear legislative intent of the Wrongful Death Act. See id. at 771.
Finally, we perceive what we view as weaknesses, if not fallacies, in the Spilman court's reasoning. The suggestion is made therein that limiting the damages to those awardable under the Wrongful Death Act would make it "cheaper for a nursing home to kill its residents and thereby limit claims by personal representatives to the damages listed in the Wrongful Death Act."[6]Id. at 870 (citations omitted). We are not prepared to agree that elimination of a decedent's cause of action for personal injuries and substituting therefor a survivor's cause of action for their damages makes it "cheaper" to kill than to merely injure. Along the same lines the Spilman court also reasoned that absent entitlement to recover for decedent's pain and suffering, the nursing home will have escaped accountability for its conduct simply because the resident died from the injuries. But punishing the nursing facility and compensating the injured parties are two separate considerations, and the Wrongful Death Act, by providing for damages recoverable by the decedent's survivors, adequately compensates for the wrong.
Thus, in the absence of any language in the 1986 amendment to section 400.023, Florida Statutes (1995), which clearly and explicitly gives to the personal representative of a deceased nursing facility resident a right of action for the deceased's pain and suffering when the death results from deprivation of the deceased's rights, we hold that the elements of damages recoverable by the personal representative of a deceased nursing home resident whose death results from deprivation of the deceased's rights are limited to those which a personal representative is specifically authorized to recover under the Wrongful Death Act. The jury's award for the element of Barnes's pain and suffering is therefore vacated and upon remand the judgment should be modified accordingly.
THE PUNITIVE DAMAGES AWARD
Defendants make a two-pronged argument on the issue of punitive damages: (a) that the evidence did not justify an award of punitive damages; and (b) that, in any event, the $4,500,000 punitive award bears *1197 no relation to First Healthcare's ability to pay.
The type of conduct
necessary to sustain an award of punitive damages must be of a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them."
White Constr. Co., Inc. v. Dupont, 455 So.2d 1026, 1029 (Fla.1984) (quoting Carraway v. Revell, 116 So.2d 16, 20 n. 12 (Fla.1959)); Eichenbaum v. Rossland Real Estate, Ltd., 502 So.2d 1333, 1335 (Fla. 4th DCA 1987).
It is plaintiff's position, however, that section 400.023(5), Florida Statutes (1995), was intended to set a less stringent standard for the award of punitive damages in cases brought under section 400.023, Florida Statutes (1995). Section 400.023(5) provides:
For the purpose of this section, punitive damages may be awarded for conduct which is willful, wanton, gross or flagrant, reckless, or consciously indifferent to the rights of the resident.
We see a great similarity, both in the precise words used and in the clearly expressed intent, between the common law standard for punitive damage conduct and the statutory standard set out in section 400.023(5): the former expansive, the latter succinct, the essence of each the samepunitive damages may be awarded only where the conduct is of an extreme or egregious nature.
The presumption is that a statute was not intended to alter the common law "other than by what was clearly and plainly specified in the statute." Jackson v. State, No. 98-1171, 736 So.2d 77 (Fla. 4th DCA 1999) (quoting Ady v. American Honda Fin. Corp., 675 So.2d 577, 581 (Fla. 1996)). Section 400.023 uses words found in various statements of the common law standard for punitive damages, without "clearly and plainly" signalling an intent to depart from that standard. We hold that section 400.023(5) adopts the common law punitive damage standard, and not, as plaintiff contends, some less stringent standard applicable exclusively to nursing home residents.
Viewed most favorably to plaintiff, there was evidence that defendants knew, when Barnes was placed in the nursing home, that he had dementia and had been placed there because he needed close supervision to keep him from wandering off on his own; that he was on seven medications, including three psychotropic drugs; that he had a visual impairment; that the staff was aware that he had wandered off the premises on a number of occasions; that he had been found at a store across the street on a number of occasions, and at a store farther down the street at least once; that he had twice injured himself and could not remember how he did it; that the sliding glass door that opened to the outside from his room was stuck in a position sufficiently ajar to allow him to get out; that in response to his wife's request, defendants had promised to repair the door, but never did; that his wife had requested that defendants equip him with a device known as a wanderguard (which would activate an alarm if he left the building) and had consistently reminded the defendants of the necessity of maintaining an awareness of Barnes's whereabouts; and that due to Barnes's age and physical impairments it was dangerous for him to leave the premises unaccompanied.
We hold that such evidence was sufficient for the jury to conclude that defendants were "consciously indifferent to the rights of the resident" within the meaning *1198 of section 400.023 and award punitive damages.

OTHER ISSUES
The remaining issues, which concern the amount of punitive damages, evidentiary rulings, comments of counsel, and the trial court's exercise of its discretion in applying a multiplier in awarding attorneys' fees, have been considered and found to be without merit and do not warrant discussion.
The award of damages for decedent's pain and suffering is vacated. The judgment on the verdict is remanded for the entry of a modified judgment for the plaintiff in accordance herewith. The judgment for attorneys' fees and the judgment for costs are severally affirmed.
TAYLOR, J., concurs.
GROSS, J., concurs in part and dissents in part with opinion.
OWEN, WILLIAM C., Jr., Senior Judge, concurs in part and dissents in part with opinion.
GROSS, J., dissenting in part.
I dissent from that portion of the majority opinion concerning the construction of section 400.023, Florida Statutes (1995). I agree with the analysis of the fifth district in Beverly Enterprises-Florida, Inc. v. Spilman, 661 So.2d 867 (Fla. 5th DCA 1995).
OWEN, WILLIAM C., Jr., Senior Judge, dissenting in part.
The type of conduct necessary to sustain an award of punitive damages is correctly set out in the majority opinion. I dissent only from the holding that the evidence was sufficient to sustain an award of punitive damages. The recitation of facts set forth in the majority opinion shows that defendants failed to adequately and properly supervise Barnes, and that this negligent conduct caused his death. But, in my opinion, this sum total of misconduct, occurring over a period of twenty months while (we may assume) Mr. Barnes was otherwise properly cared for, is not legally sufficient to be an "entire want of care," nor does it rise to the level of the type of willful and wanton misconduct equivalent to criminal manslaughter which the courts have consistently held is required for the imposition of punitive damages. See American Cyanamid Co. v. Roy, 498 So.2d 859 (Fla.1986); Como Oil Co. v. O'Loughlin, 466 So.2d 1061 (Fla.1985); White Constr. Co., Inc. v. Dupont, 455 So.2d 1026 (Fla.1984); Jeep Corp. v. Walker, 528 So.2d 1203 (Fla. 4th DCA 1988). I would be quite surprised if my colleagues would, on these same facts, uphold a criminal conviction for manslaughter. I think the jury's award of punitive damages against First Healthcare should be vacated. In all other respects I fully concur in the majority opinion.

ON MOTIONS FOR REHEARING
GROSS, J.
We deny First Healthcare's motion for rehearing and rehearing en banc.
The motion adopts the point raised in Judge Owen's dissent that the evidence did not rise to "the type of willful and wanton misconduct equivalent to criminal manslaughter which the courts have consistently held is required for the imposition of punitive damages." Cases such as Jeep Corp. v. Walker, 528 So.2d 1203 (Fla. 4th DCA 1988), have employed language indicating that the standard for punitive damages is whether the defendant's conduct "exhibited a reckless disregard for human life equivalent to manslaughter." Id. at 1206 (quoting Chrysler Corp. v. Wolmer, 499 So.2d 823, 825 (Fla.1986) (emphasis added in Jeep Corp.)).
First Healthcare and the dissent have seized on the quoted language to argue, in essence, that the standard for imposing criminal liability is higher than the punitive damage standard quoted in the majority opinion and that the conduct in this *1199 case did not rise to such an elevated standard. For example, First Healthcare argues that conduct justifying punitive damages must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Payton Health Care Facilities, Inc. v. Estate of Campbell, 497 So.2d 1233, 1240 (Fla. 2d DCA 1986). If there is such an elevated standard, the contention goes, then this case conflicts with Jeep Corp. and other similar cases.
The Jeep Corp. line of cases did not change the law of punitive damages in its equation of the conduct sufficient to support an award of punitive damages with that necessary to support a criminal manslaughter conviction. Section 782.07(1), Florida Statutes (1997), proscribes the killing of a human being by "culpable negligence." The Florida Standard Jury Instructions in Criminal Cases, defines "culpable negligence":
I will now define "culpable negligence" for you. Each of us has a duty to act reasonably toward others. If there is a violation of that duty, without any conscious intention to harm, that violation is negligence. But culpable negligence is more than a failure to use ordinary care toward others. In order for negligence to be culpable, it must be gross and flagrant. Culpable negligence is a course of conduct showing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or such an indifference to the rights of others as is equivalent to an intentional violation of such rights.
Fla. Std. Jury Instr. (Crim.) [101].
This standard is identical to that quoted in the majority opinion for punitive damages, even though a few words are different. We thus perceive no conflict between this case and Jeep Corp. regarding the standard for punitive damages. A significant difference between a civil punitive damages case and a criminal manslaughter case under section 782.07(1) is in the burden of proof necessary to sustain a criminal conviction. That evidence which would justify an award of punitive damages might not rise to the level of proof beyond a reasonable doubt necessary to convict for manslaughter.
In Chrysler Corp. v. Wolmer, the supreme court wrote that "punitive damages are warranted only where the egregious wrongdoing of the defendant, although perhaps not covered by criminal law, nevertheless constitutes a public wrong." 499 So.2d at 825. In this case, the type of wrongdoing at issue is precisely covered by a criminal statute.
The legislature has passed a manslaughter statute directed at the type of conduct involved in this case. Section 782.07(2), Florida Statutes (1997) provides:
A person who causes the death of any elderly person or disabled adult by culpable negligence under s. 825.102(3) commits aggravated manslaughter of an elderly person or disabled adult, a felony of the first degree.
Section 825.102 criminalizes abuse, aggravated abuse, and neglect of an elderly person or disabled adult. Section 825.102(3)(b) is directed at a person "who willfully or by culpable negligence neglects an elderly person or disabled adult and in so doing causes great bodily harm, permanent disability, or permanent disfigurement." Section 825.102(3)(a) defines "[n]eglect of an elderly person or disabled adult" as
1. A caregiver's failure or omission to provide an elderly person or disabled adult with the care, supervision, and services necessary to maintain the elderly person's or disabled adult's physical and mental health, including, but not limited *1200 to, food, nutrition, clothing, shelter, supervision, medicine, and medical services that a prudent person would consider essential for the well-being of the elderly person or disabled adult; or
2. A caregiver's failure to make a reasonable effort to protect an elderly person or disabled adult from abuse, neglect, or exploitation by another person.
Neglect of an elderly person or disabled adult may be based on repeated conduct or on a single incident or omission that results in, or could reasonably be expected to result in, serious physical or psychological injury, or a substantial risk of death, to an elderly person or disabled adult.
Reading section 782.07(2) together with section 825.102(3) leads to the conclusion that one version of manslaughter is committed by a person who, by culpable negligence, causes the death of an elderly person through "neglect of an elderly person or disabled adult" as defined by section 825.102(3)(a).
By this special manslaughter statute, the legislature has declared the conduct it describes to be a "public wrong" contemplated by Chrysler Corp. v. Wolmer. Taken in the light most favorable to the plaintiff, the evidence supports both a finding of culpable negligence justifying an award of punitive damages and of manslaughter under section 782.07(2). The dry recitation of facts supporting punitive damages in the panel opinion does not give the full sense of the case. To those facts, we add the following as contained in the appellee's response to the motion for rehearing, which are supported by the evidence at trial:
[D]espite their awareness of [the decedent's] condition ... [t]he Defendants permitted [the broken sliding glass door] to remain for over one and a half years, despite repeated requests by the decedent's wife to repair the door, and despite repeated representations that they would do so. Additionally, the Defendants refused to place a simple device known as a wanderguard on the decedent's wrist, which would have set off an alarm if he left the facility, despite repeated requests by his widow and [the decedent's] express willingness to wear the wanderguard.
The Defendants continued to do nothing to protect the decedent, despite their knowledge that he regularly wandered away from the facility, including repeatedly crossing a four lane divided highway to go to a nearby store. They also knew that he was frequently disoriented, as their records contain 38 references to the decedent being in a confused state. However, Defendants did not record their awareness of his leaving the facility on a regular basis, and withheld this information from Barnes' treating physicians. When confronted with this failure to record this critical information, Defendants' expert, Dr. Blazer, testified that he had never encountered a case like this where repeated behavior was occurring and not being recorded in the resident's chart.
[O]n four occasions the decedent signed himself out of the facility, sometimes putting his name in the destination column. Additionally, on two occasions, he suffered injuries the cause of which could not be explained, obviously because of the Defendants' lack of supervision.
Finally, the corporate Defendant's awareness of the egregiousness of its misconduct is demonstrated by the fact that its administrator manufactured a fraudulent document, that attempted to cover up its total lack of care by placing blame on the decedent's widow.... Further evidence of the corporate Defendant's attempt to cover up its misconduct is the fact that all of the Defendant's employees denied that the door in the decedent's room was broken in the open position, a fact which was established by ... the testimony of the investigating police officer.
*1201 Again, we emphasize that it is the different burden of proof that makes criminal liability problematic. A close civil case for punitive damages will not usually yield a criminal prosecution.
Appellants' motion for rehearing and rehearing en banc is denied. We also deny appellee's motion for rehearing, but we certify conflict with Beverly Enterprises-Florida, Inc. v. Spilman, 661 So.2d 867 (Fla. 5th DCA 1995).
TAYLOR, J., concurs.
OWEN, WILLIAM C., Jr., Senior Judge, dissents without opinion.
NOTES
[1] Each of these objections, stated baldly and without particulars, is patently without merit as the court found following the hearing on plaintiff's motion to compel. Such "stonewalling tactics," designed to delay making a timely response to valid discovery requests, constitute discovery abuse and should not be condoned.
[2] In Greenleaf v. Amerada Hess Corp., 626 So.2d 263, 264 n. 1 (Fla. 4th DCA 1993), the court commented that where a party had objected to production on the grounds that the requested material was protected from discovery, and then upon the objection being overruled, had filed a response that such material did not exist, such action constituted discovery abuse and improper delaying tactics. That comment, though dicta in the Greenleaf case, is not dicta here and we affirm that view.
[3] Nor are we, this somewhat incredible argument striking us as little more than a semantic shell game. An "incident" report is a generic description, not a name tag.
[4] We would note, in passing, that although the court's pre-emptive instruction to the jury did not apply to the administrator, the jury apparently had no difficulty in finding against the administrator as well.
[5] Although the defendants cite to Arthur v. Unicare Health Facilities, Inc., 602 So.2d 596 n. 1 (Fla. 2d DCA 1992), as well as to this court's citing Arthur with approval in Greenfield v. Manor Care, Inc., 705 So.2d 926, 933 (Fla. 4th DCA 1997), app. dism., 717 So.2d 534 (Fla.1998), neither case involved the issue raised here so far as we can discern, and thus any comment in either on this issue would have to be viewed as dicta.
[6] That paraphrase of an ancient statement, originally made more than 150 years ago and the premise for the adoption of Lord Campbell's Act, simply ignores that the same can be said of every tortfeasor whose wrongdoing causes injury to and resulting death of another. It seems illogical that the elements of damages recoverable by a decedent's personal representative would vary depending upon whether the decedent was or was not a resident of a nursing facility at the time of the injury causing death.