874 So.2d 596 (2004)
ESTATE OF Gertie Mae YOUNGBLOOD, et al., Appellants/Cross-Appellees,
v.
HALIFAX CONVALESCENT CENTER, LTD., etc., et al., Appellees/Cross-Appellants.
No. 5D02-1957.
District Court of Appeal of Florida, Fifth District.
January 23, 2004.
Rehearing Denied June 10, 2004.
*597 Bennie Lazzara, Jr., Susan B. Morrison, and John R. Cummings of Wilkes & McHugh, P.A., Tampa, for Appellant/Cross-Appellee.
Scott A. Mager, Elaine J. LaFlamme, and Mager Shafer, Ft. Lauderdale, and Stephen B. Sambol of Alvarez, Sambol, Winthrop and Madson, P.A., Orlando, for Appellee/Cross-Appellant.
*598 SHARP, W., J.
Rosa Abner, the daughter of Gertie Mae Youngblood, appeals from a final judgment in favor of Delta Health Group ("Delta"). On July 7, 1998, Abner filed suit against Halifax Convalescent Center, Ltd. and Halifax Convalescent Center, Inc. (collectively referred to hereafter as "Halifax"), in her capacity as guardian of Youngblood. Abner sought damages for the alleged negligent treatment and care of Youngblood, and deprivation of her nursing home rights established by Chapter 400, which Youngblood experienced while she was a resident of the nursing home owned and operated by Halifax. On February 1, 1998, the nursing home where Youngblood resided was sold and Delta assumed its operation. Youngblood remained a resident of the nursing home under Delta's care until July 8, 1998, when Abner transferred her to another nursing facility because she was not satisfied with the care her mother was receiving.
After Youngblood died on January 18, 2000, Abner continued the litigation as her mother's personal representative and joined Delta in the lawsuit, asserting common law negligence claims and deprivation of Youngblood's Chapter 400 rights for the time Youngblood was a resident while Delta operated the nursing home. Abner added a claim that deprivation of Youngblood's Chapter 400 rights caused her mother's death, and she sought punitive damages.[1]
Prior to trial, Abner settled with Halifax. Delta filed a motion for summary judgment as to the Chapter 400 claims, because there was no evidence (as Abner admitted) that a violation of Youngblood's Chapter 400 rights caused her death. The trial court granted summary judgment as to the Chapter 400 claims, relying on Beverly Enterprises-Florida, Inc. v. Knowles, 766 So.2d 335 (Fla. 4th DCA 2000). The case proceeded against Delta solely on the *599 common law negligence claims. At the close of the evidence, the trial judge directed a verdict against Abner on punitive damages, and the jury returned a verdict for Delta on the common law negligence claims.
Abner argues on appeal that the trial court abused its discretion in allowing Delta to peremptorily challenge the only two African-American persons on the venire. Abner and Youngblood are of African-American descent. Abner also argues that Beverly Enterprises-Florida, Inc., was decided incorrectly and that this court should reject the holding in that case. We agree on both grounds.
Delta cross appeals the trial court's denial of its motion for attorney's fees pursuant to section 57.105, Florida Statutes. We affirm, finding that this lawsuit was not one for which section 57.105 fees should have been awarded, under either the 2001 version of the statute or the prior version, whichever may be applicable. Delta also cross appeals the trial court's refusal to include Halifax on the verdict form as a Fabre defendant.[2] We also affirm that ruling. The record discloses that this case was tried with a clear time line demarcation of liability between Halifax and Delta. Delta took the position that it was the successive operator of the nursing home, following Halifax's operations, and any defects or failures of Halifax's treatment of Youngblood occurred before and were separate from any activities undertaken by Delta. Delta's briefs filed in this cause also assert that any negligence which occurred, happened while Halifax was operating the nursing home and that it was responsible only for operation of the nursing home activities after it assumed control. Thus, any claim or theory that Delta may have had as a joint tortfeasor with Halifax has been waived.
I. Peremptory Challenge
Abner argues that the trial court failed to evaluate the reasonableness, accuracy and genuineness of the reasons given by Delta for peremptorily challenging the only two African-American venire persons in this case, pursuant to the directives of Melbourne v. State, 679 So.2d 759 (Fla. 1996). Melbourne sets out a three-step process for determining whether a party is exercising a peremptory challenge against a juror for unconstitutional and improper (here race-based) reasons. This case involves the third step.[3]
In Melbourne, the court said that in undertaking the third step, the trial court should consider the circumstances surrounding the strike, to determine the genuineness and credibility of the reasons given for the strike. The reasonableness of the grounds given may be a part of this consideration.
Relevant circumstances may include but are not limited tothe following: the racial make-up of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged *600 juror, or singling the challenged juror out for special treatment.
679 So.2d at 764, n. 8. In this case, the record demonstrates that all of the factors mentioned in Melbourne for a step-three determination indicate at least one African-American venire person in this case was struck for pretextual reasons.
Delta exercised a peremptory challenge against juror Number 12, Irvin, one of the only two African-American persons on the venire. Counsel for Abner raised a Neil objection.[4] Delta's counsel cited Irvin's work and experience in health care. Irvin had worked in a doctor's office who practiced urology, and had helped to position patients during various procedures, including those using foley catheters. Part of the evidence in this case of Delta's mistreatment of Youngblood was that a foley catheter was improperly removed, thereby causing Youngblood severe pain. Counsel also said Irwin made various facial gestures or nods during voir dire questioning, which indicated a bias in favor of the plaintiff.
These physical gestures are not documented on the record.[5] But we note that the trial judge accepted Delta's counsel's statements and we as appellate judges cannot deny that they occurred. Counsel for Delta also noted that Delta had accepted another African-American woman, Morris, on the jury to bolster his assertion that the strike was race-neutral. Based on this record, we affirm the trial court's decision to allow the peremptory challenge as to Irvin. See Young v. State, 744 So.2d 1077, 1084 (Fla.1999); Greene v. State, 718 So.2d 334, 335 (Fla. 3d DCA 1998).
Later in the jury selection process, the trial judge asked Delta's counsel if he had any other strikes. He said he was going to exercise a peremptory challenge on Morris, the African-American woman he had earlier accepted as a jury member. This left the venire without any African-American members. Counsel for Abner objected and demanded a race-neutral reason, because striking Morris would leave the venire without an African-American. The trial judge asked for reasons. Delta's counsel said:
She had a family history of having a grandfather who had a stroke resulting in neurologic deficits that included right-sided weakness. The plaintiff also had a stroke, suffered from the same neurologic deficits. It may be too close. (emphasis supplied).
The court asked him to repeat this and Delta's counsel said:
Her grandfather who had a stroke very similar to the stroke that was suffered by Gertie Youngblood. And we're just not comfortable with having a juror who's going to basically be hearing about an individual who had the same deficits, the same problems as the stroke victim, just like her grandfather was, who apparently she was very close to. (emphasis supplied).
Counsel for Abner pointed out that the reasons given by Delta's counsel were not supported by what Morris had said, and that they in fact applied more accurately to another juror, Sholes (a Caucasian female), who was not challenged and who ended up serving on the jury. In an effort to distinguish why he struck Morris and not Sholes, the attorney for Delta said *601 Sholes' grandmother had a "different stroke and it did not result in a significant deficit." The trial court accepted the strike against Morris without further inquiry. However, an examination of the record discloses that both counsel and the trial judge may have been confused about the responses of the two jurors.
The record discloses that, during voire dire, Morris said that when she was seven years old her grandfather had a stroke and was paralyzed on his left side. His speech was not affected. Morris did not describe his neurological deficits and said nothing about visiting him often or being "close" to him. The stroke had occurred some 20 years earlier and Morris was a mature, married woman with a post graduate degree, who was employed as a high school math teacher at the time of the trial.
During voir dire, Sholes said that six or seven years ago her grandmother had a stroke, and was in two nursing homes over a three-year period. Thereafter, she visited her grandmother every few weeks, traveling to Dade County. The grandmother was unable to care for herself. She eventually died of old age. Sholes did not describe what kind of stroke her grandmother suffered or what her neurological deficits were.
Florida courts have repeatedly held it is racially discriminatory to exercise a peremptory challenge against a person who is a member of a minority group where the proffered race-neutral reasons apply equally to a juror of another racial group, who has not been challenged. See Hall v. Daee, 602 So.2d 512 (Fla.1992); Fleming v. State, 825 So.2d 1027, 1029 (Fla. 1st DCA 2002); Smith v. State, 799 So.2d 421, 425 (Fla. 5th DCA 2001); Daniel v. State, 697 So.2d 959, 960-61 (Fla. 2d DCA 1997); Richardson v. State, 575 So.2d 294 (Fla. 4th DCA 1991). In this case, the reasons given to strike Morris apply even more strongly to Sholes, and Delta's counsel's efforts to distinguish Morris from Sholes are not supported by the record.
Accordingly, this case must be reversed for a new trial. Williams v. State, 574 So.2d 136 (Fla.1991); State v. Slappy, 522 So.2d 18 (Fla.1988)[6]; Shuler v. State, 816 So.2d 257 (Fla. 2d DCA 2002); McCarter v. State, 791 So.2d 557 (Fla. 2d DCA 2001); Daniel v. State, 697 So.2d 959 (1997). We can only conclude that the trial court erred in not ruling that the reasons given by Delta's counsel to challenge Morris were pretextual. Fleming; Gilliam v. State, 645 So.2d 27 (Fla. 3d DCA 1994); Reeves v. State, 632 So.2d 702 (Fla. 1st DCA 1994). Even a single individual strike of an African-American prospective juror that is racially motivated is not permissible. State v. Johans, 613 So.2d 1319 (Fla.1993); Hall; Slappy; Fleming; Suggs v. State, 624 So.2d 833 (Fla. 5th DCA 1993).
II. Chapter 400 Claims Not Resulting in the Death of the Nursing Home Resident and Beverly Enterprises-Florida, Inc. v. Knowles.
At the time this litigation took place, Beverly Enterprises v. Knowles was the only appellate decision in this state which directly addressed the issue of whether Chapter 400 claims of deprivation of a nursing home resident's rights, which do not cause or contribute to the resident's death, survive the resident's death.[7] That *602 case held that pursuant to the version of section 400.023 which was in effect at the time Youngblood died (in 2000), unless the deprivation of a nursing home resident's rights caused the resident's death, a personal representative of the deceased resident has no cause of action against a nursing home for deprivation of Chapter 400 rights. The trial court in this case was bound by that decision.[8]
In 2000, section 400.023(2), Florida Statutes (1997) provided:
Any resident whose rights as specified in this part are deprived or infringed upon shall have a cause of action against any licencee responsible for the violation. The action may be brought by the resident or his or her guardian, by a person or organization acting on behalf of a resident with the consent of the resident or his or her guardian, or by the personal representative of the estate of a deceased resident when the cause of death resulted from the deprivation or infringement of the decedent's rights. The action may be brought in any court of competent jurisdiction to enforce such rights and to recover actuarial and punitive damages for any deprivation or infringement on the rights of the resident. (emphasis supplied).
In Beverly Enterprises v. Knowles, decided by our sister court, the nursing home resident suffered serious ailments allegedly because of improper treatment and care in a nursing home. He was transferred to a hospital where he died, but the death was not caused by his alleged poor treatment in the defendant nursing home. Following his death, the deceased resident's personal representative sued the nursing home for deprivation of the deceased's Chapter 400 rights. The court thought the language of the statute was so clear that no historical view or interpretation was necessary. It surmised that the Legislature could reasonably have determined that many of the Chapter 400 rights of nursing home residents spelled out in section 400.022 are personal to the resident, such as the right to organize, participate in groups, manage one's personal affairs, and privacy issues. Thus, the court reasoned, perhaps deprivation of those rights should not survive a resident's death.
In this court's opinion in Beverly Enterprises-Florida, Inc. v. Spilman, 661 So.2d 867 (Fla. 5th DCA 1995), approved, Florida Convalescent Centers v. Somberg, 840 So.2d 998 (Fla.2003), we considered the legislative history of section 400.023 in determining a different issue, i.e.: In a lawsuit brought by a personal representative against a nursing home for deprivation of a resident's Chapter 400 rights, which deprivation is alleged to have caused the resident's death, is the nature and measure of damages controlled and limited by the Wrongful Death Act, section 768.16? At that time, the section contained the following additional language: "The remedies provided in this section are in addition to and cumulative with other legal and administrative remedies available to a resident and to the agency." (emphasis supplied)
In Beverly Enterprises v. Spilman, Judge Peterson quoted extensively from the Legislative discussions in the House when section 400.023 was revised to include the right of a personal representative of a deceased nursing home resident to bring a lawsuit under this chapter. *603 Representative Canady was quoted as explaining that the revision was "simply to extend that cause of action to the personal representative of the estate of a deceased nursing home resident" to enforce Chapter 400 rights. The rights he referenced were:
So essentially, if a resident of a nursing home is mistreated in some way-and that's really what it all boils down to-then the resident can sue the operator of the nursing home for damages and so on to redress that wrong that has been done.
There is no clear indication from the discussion that the Legislature intended to make only those deprivations resulting in a nursing home resident's death survive.
We found the statute unclear in Beverly Enterprises v. Spilman, and looked to the public policy behind the Chapter 400 legislation to interpret it. Quoting the answer brief of the Office of State Long Term Care Ombudsman, Judge Peterson noted that were damages in such a case limited to those allowed by the Wrongful Death Act, it would greatly weaken the statute, since it would be much cheaper to kill a nursing home resident than to keep one alive and able to sue for deprivation of Chapter 400 rights. This is so because the elderly, generally frail persons in nursing homes, often have little or no damages to claim under the Wrongful Death Act.[9] Further in 1995, section 400.023 expressly provided that "the remedies provided in this section are in addition to and cumulative with other legal and administrative remedies available to a resident and to the agency."
In the case sub judice, the lawsuit was brought by the guardian, Abner, before the nursing home resident (Youngblood) died. Should all of the alleged deprivation of Chapter 400 rights suffered during Youngblood's lifetime dissolve simply because they cannot be connected to the cause of her death? The language in section 400.023[10] makes the answer to this question unclear. Florida Rule of Civil Procedure 1.260(a) provides that when a party to an action dies, and the claim is not extinguished, the court may order substitution of the proper party; i.e., here the personal representative.
There is nothing in section 400.023 which provides or infers that once an action is brought and the party later dies, the cause of action also dies with the nursing home resident. It is logical that the survival statute would save the cause of action. It provides:

Actions; surviving death of a party. No cause of action dies with the person. All causes of action survive and may be commenced, prosecuted and defended in the name of the person prescribed by law.
§ 46.021, Fla. Stat.
Thus in a case such as this where the suit was filed before the nursing home resident's death, all deprivation of Chapter 400 rights, including those resulting in the death of a resident but not exclusive of those, should survive the death of the nursing home resident. See Niemi v. Brown and Williamson Tobacco Corp., 862 So.2d 31 (Fla. 2d DCA 2003). A contrary interpretation would encourage nursing homes to drag out litigation until the nursing *604 home resident diesnot an impractical solution given the age and state of health of most nursing home residents.
However, Delta was an independent party added to this lawsuit after Youngblood died, and thus the fact that Abner sued Halifax initially, and asserted deprivation of Chapter 400 rights prior to Youngblood's death does not place Delta in the same position as Halifax via the relation-back doctrine.[11] Delta stands in a similar posture to the nursing home defendant in the fourth district's Beverly Enterprises v. Knowles case. We cannot distinguish that case from the one before us.
In Thompson v. Kindred Nursing Centers East, LLC, 211 F.Supp.2d 1345 (M.D.Fla.2002), the court ruled that a nursing home's motion to dismiss the Chapter 400 claims not related to causation of the resident's death should be denied. It is not clear from that case whether it involved the same version of section 400.023(1) that is involved in the case sub judice, or whether the more recent statute governed that lawsuit. In Thompson v. Kindred Nursing, the suit was filed in state court in October of 2001, and removed to the federal court in November 2001. But it is not clear when the nursing home resident died, which would determine which version of section 400.023 applied.[12]
In May of 2001, section 400.023(1) was changed as follows:
(1) Any resident whose rights as specified in this part are violated shall have a cause of action. The action may be brought by the resident or his or her guardian, by a person or organization acting on behalf of a resident with the consent of the resident or his or her guardian, or by the personal representative of the estate of a deceased resident regardless of the cause of death.... If the action alleges a claim for the resident's rights or for negligence that did not cause the death of the resident, the personal representative of the estate may recover damages for the negligence that caused injury to the resident. (emphasis supplied)
In Thompson, Judge Kovachevich stated that prior to the most recent amendment of section 400.023(1) (quoted above), it was unclear whether a personal representative who filed suit after the nursing home resident died, could recover damages unrelated to the cause of death for a deceased resident's rights under chapter 400. She noted the conflicting provisions at the end of the 1997 version.

The action may be brought in any court of competent jurisdiction to enforce such rights and to recover actual and punitive damages for any deprivation or infringement on the rights of a resident. (emphasis supplied).
§ 400.023, Fla. Stat. (1997). She concluded the statute was in fact ambiguous, despite the fourth district's 2000 opinion in Beverly Enterprises v. Knowles, but pointed to the 2001 version of section 400.023 as controlling in that case.
We agree with Judge Kovachevich that under the 1997 version of section 400.023(1), it was not clear whether a personal representative could bring an action for deprivation of Chapter 400 rights of a deceased nursing home resident, if the deprivation *605 of those rights did not cause the death. It would be inequitable to allow non-death causing claims under Chapter 400 to be prosecuted after a nursing home resident's death by a personal representative where the nursing home resident filed suit prior to death, and yet deny such claims on behalf of a nursing home resident who died before a suit could be brought. This interpretation would make it cheaper to kill a resident than to properly care for him or her, as noted in our Beverly Enterprises v. Spilman opinion, contrary to the stated public policy of the statute. Further, after a resident's death, it could excuse nursing homes from the duties and obligations established by Chapter 400, to provide proper accounting records, cost statements and justifications, and loss of personal property, which are among the other rights provided in Chapter 400.022.
This is a case in which we think the most recent version of section 400.023 should be employed to determine the true Legislative intent as to the meaning of this older, ambiguous version of the statute.[13] It was unclear before, in our view, and the revision made in 2001 clarifies that the Legislature intended to create a new statutory cause of action for nursing home residents, and that it intended that those statutory rights be upheld and prosecuted if violated, on behalf of the nursing home resident by a proper party or by the resident's personal representative, even though the deprivations do not cause the resident's death, and even if the suit is brought after the resident's death.
On remand, Abner should be entitled to a new trial on her Chapter 400 claims as well as her common law negligence claims. We also agree she should have the opportunity to present evidence on her punitive damage claims. Chapter 400 expressly provides that such damages are available. Section 400.023(5) provides:
For the purpose of this section, punitive damages may be awarded for conduct which is willful, wanton, gross or flagrant, reckless or consciously indifferent to the rights of the resident.
In this case, the trial judge relied on this court's opinion in Beverly Enterprises v. Spilman in determining that the evidence adduced did not rise to the level required for punitive damages. The judge said of Spilman that he thought it was "one of the worst cases you can imagine." He continued:
But I think that clearly is the standard that we have to follow. I see no view of the evidence in this case which would warrant a punitive claim either on a direct basis, that is finding some willful wanton and neglect by a supervisory person, nor an indirect view, where there was some gross willful wantonno even gross, its got to be beyond gross, its got to be willful, wanton, reckless conduct by an employee and some fault by the corporate defendant. (emphasis supplied)
We agree that the evidence of mistreatment and lack of care of Youngblood did not rise to the level in the Beverly Enterprises v. Spilman case. However, the statute does not require such a high bar; it does not require conduct that is "beyond gross." In Payton Health Care v. Estate of Campbell, 497 So.2d 1233 (Fla. 2d DCA 1986), the court affirmed a punitive damage award based on expert testimony that the nursing care was "an outrageous deviation from the acceptable standard." An appellate court may affirm *606 a directed verdict only where no proper view of the evidence could sustain a verdict in favor of the non-moving party. Owens v. Publix Supermarkets, Inc., 802 So.2d 315, 329 (Fla.2001).
In this case there was considerable testimony from Delta's own former employees and Director of Nursing to establish Delta's abuse of Youngblood. For example, while Delta was in charge, Youngblood developed a new State III pressure sore on her right heel, an unexplained injury to her eye and a contusion which later became infected. While Delta was operating the nursing home, the staff discovered Youngblood's foley catheter had come out with the bulb fully inflated, causing extreme pain. No pain management was initiated for any of these injuries. A nurse expert testified that the overall care afforded Youngblood by Delta was "outrageously deficient." This mistreatment was linked to Delta's conscious decision to keep the facility chronically understaffed due to budget problems.
Based on the mandate to view the evidence in the light most favorable to the party seeking damages and having to view every reasonable inference from that evidence in favor of the party against whom a motion for directed verdict is made, we conclude that a verdict should not have been directed on punitive damages. See Scott v. TPI Restaurants, Inc., 798 So.2d 907, 909 (Fla. 5th DCA 2001); Beverly Enterprises v. Spilman.
We certify a conflict with our sister court in its Beverly decision and reverse for a new trial.
REVERSED; Conflict CERTIFIED.
SAWAYA, C.J., and GRIFFIN, J., concur.
NOTES
[1] The allegations against Delta are, in sum:

 At admission, Gertie had some weakness in her right hand but suffered no contractures, which resulted from her stroke; within three weeks of her admission, she began experiencing painful muscle contractures in all of her extremities, which worsened over time due to Delta's failure to properly care for them.
 Gertie's records contain a gap of one month (between February 27 and March 26) in which no nurses notes appear.
 Delta lost track of Gertie's whereabouts for one week; a note indicates she was discharged on July 1, 1998; there is no further documentation until July 8, 1998 when a note indicates she was transferred to another facility.
 Gertie developed numerous pressure ulcers during her residence, and after February 1, 1998, when Delta took over operation, a new Stage III pressure sore developed in her right heel which required a painful debridement.
 During Delta's ownership, Gertie suffered an unexplained injury to her eye, and a contusion which later became infected.
 Staff discovered her Foley catheter had come out with the bulb still fully inflated; there was no explanation how this painful event occurred, and no pain assessment or pain management was initiated.
 Gertie was regularly found her in her own dried feces and urine.
 Gertie regularly suffered from poor hygiene in general, including poor mouth care, uncut and dirty nails, a feeding tube that was too clogged and blocked to allow for feeding, and a room that smelled from urine.
 There was chronic staffing problems during Delta's operation of the facility. The Director of Nursing testified that there was a chronic shortage of certified nursing assistants (CNAs) to perform basic custodial care, and he was constantly pressured by Delta's corporate supervisors to meet the staffing budget. He was even instructed to send CNAs home if he didn't meet the budget numbers. Unlicenced and uncertified CNAs were employed and employees were instructed to engage in fraudulent charting.
 A nurse testified that Gertie's care during Delta's ownership was outrageous.
[2] Fabre v. Marin, 623 So.2d 1182 (Fla.1993).
[3] In Melbourne v. State, 679 So.2d 759, 762 (Fla.1996), the court described the first two steps:

A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. [step 1] If these initial requirements are met, the court must ask the proponent of the strike to explain the reason for the strike. At this point, the burden of production shifts to the proponent of the strike to come forward with a race neutral explanation. [step 2]
[4] State v. Neil, 457 So.2d 481 (Fla.1984).
[5] A juror's lack of interest, inattentiveness or other nonverbal behavior can constitute a racially neutral reason for a strike. Dorsey v. State, 868 So.2d 1192 (Fla. 2003). However, this behavior must have been observed by the trial court or have record support. Dorsey.
[6] Receded from other grounds, Melbourne v. State, 679 So.2d 759 (Fla.1996).
[7] But see Beverly Enterprises-Florida, Inc. v. Estate of Margaret Maggiacomo, 651 So.2d 816 (Fla. 2d DCA 1995), quashed, 661 So.2d 1215 (Fla.1995); Arthur v. Unicare Health Facilities, 602 So.2d 596 (Fla. 2d DCA 1992).
[8] District court opinions bind all Florida courts in the absence of inter-district conflict. See, Pardo v. State, 596 So.2d 665 (Fla.1992); State v. Sanchez, 642 So.2d 122 (Fla. 5th DCA 1994). All judges within a district must follow the ruling of the district court of appeal in that district. Sanchez.
[9] See H. Glenn Boggs and Conner, Nursing Home Tort Victims Rights and Remedies, 63 Fla. B.J. 2 at 11 (1989).
[10] Section 400.023, Fla. Stat. (1997) provides:

The action may be brought in any court of competent jurisdiction to enforce such rights and to recover actual and punitive damages for any deprivation or infringement on the rights of the resident.
[11] Thomas v. Northside Foods, Inc., 827 So.2d 378 (Fla. 3d DCA 2002); Darden v. Beverly Health & Rehabilitation, 763 So.2d 542, 543 (Fla. 5th DCA 2000).
[12] The statute in effect at the time the cause of action arises governs the action. See Cenatus v. Naples Community Hospital, Inc., 689 So.2d 302 (Fla. 2d DCA 1997); L. Ross Inc. v. R.W. Roberts Construction Co., Inc. 466 So.2d 1096 (Fla. 5th DCA 1985).
[13] It is proper for a court to consider a subsequent amendment as clarifying legislative intent. See Finley v. Scott, 707 So.2d 1112, 1116-1117 (Fla.1998); Parole Comm'n v. Cooper, 701 So.2d 543 (Fla.1997); Greenberg v. Cardiology Surgical Ass'n, 855 So.2d 234, 237, n. 1 (Fla. 1st DCA 2003), and authorities cited therein.